**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **RUDY CORPUS,** | CASE NO. 3:19 CV 2250 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **AIM LEASING COMPANY,** | **MEMORANDUM OPINION AND** |
| Defendant. | **ORDER** |

### INTRODUCTION

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 36), Motion to Strike Plaintiff's December 30, 2020 Declaration (Doc. 45), and Supplemental Motion to Strike Opposition to Motion to Strike Plaintiff's December 30, 2020 Declaration and Motion for Sanctions (Doc. 49). These matters are fully briefed and ripe for decision. For the following reasons, the Court grants in part and denies in part Defendant's Motion for Summary Judgment, grants its Motion to Strike, and denies its Supplemental Motion to Strike Opposition to Motion to Strike Plaintiff's December 30, 2020 Declaration and Motion for Sanctions.

### BACKGROUND

Plaintiff brings four claims against Defendant: (1) a Family and Medical Leave Act (FMLA) interference claim, (2) an FMLA retaliation claim, (3) a retaliation claim under Ohio law, and (4) a national origin discrimination claim under Ohio law. *See* Doc. 1.

Plaintiff started working for Defendant in October 2013. (Corpus Dep., Doc. 37-1, at 39-40) He worked as a business development specialist, selling asset management solutions and leasing commercial trucks in northwest Ohio. *Id.* at 110-11; Doc. 36-4, at 1-2. From April 2017

until Plaintiff's termination in December 2018, Plaintiff reported to Joe Telega, and Telega reported to Matt Svancara. (Telega Dep., Doc. 37-3, at 9); (Svancara Dep., Doc. 38, at 18). Plaintiff was Defendant's only Mexican American salesperson. (Doc. 40).

Plaintiff's 2013 sales scorecard showed he exceeded his $300,000 sales goal by generating $533,065 in revenue. (Doc. 39-5, at 4). In November 2014, Plaintiff received a three percent raise. (Svancara Dep., Doc. 38, at 65). Plaintiff's 2015 performance review showed Plaintiff exceeded his $500,000 sales goal by generating $742,059 of revenue. (Doc. 39-6, at 1). In February 2016, Plaintiff received a 7.875 percent raise. (Svancara Dep., Doc. 38, at 65). Plaintiff did not meet his sales goal in 2016, generating $430,801 against an annual goal of $500,000. (Doc. 39-7, at 4). But in January 2017, Plaintiff received a 2.5 percent raise. (Svancara Dep., Doc. 38, at 66).

In late 2015, Plaintiff witnessed one of Defendant's managers directing racial and sexist slurs at another Aim employee. (Corpus Dep., Doc. 37-1, at 174). Plaintiff confronted the manager after these comments (Corpus Dep., Doc. 37-1, at 185-86), and spoke to a member of Defendant's Human Resources ("HR") staff regarding the same on December 11, 2015 (Doc. 36-35, at 1).[1]

In December 2017, Plaintiff notified Carli Kuntze, Defendant's HR Manager, that he needed to take leave for a health condition. (Corpus Dep., Doc. 37-1, at 191). Kuntze provided Plaintiff with FMLA leave paperwork. (Doc. 36-12, at 3). Plaintiff never returned the paperwork. (Kuntze Decl., Doc. 36-3, at ¶ 6); (Corpus Dep., Doc. 37-1, at 192-93). Plaintiff missed a total of ten workdays, using two sick days, six vacation days, and two unpaid days off. (Doc. 36-13, at 1).

In February 2018, Plaintiff became ill again; from the hospital, Plaintiff requested information for FMLA leave from Defendant. (Doc. 36-38, at 1). Plaintiff received FMLA leave

---

1. Plaintiff does not dispute these 2015 notes show the incident occurred in 2015, not in 2017 as he initially pled. *Compare* Corpus Dep., Doc. 37-1, at 181-82 *with* Doc. 1, at ¶ 34.

from February 1, 2018 (Doc. 36-16, at 1) through May 7, 2018 (Doc. 36-25, at 1). As Plaintiff's FMLA leave began, Telega contacted him to obtain information about any pending proposals, and to retrieve customer contact information. (Telega Dep., Doc. 37-3, at 41-42). Plaintiff's testimony confirms this exchange occurred, and he also testified Telega pried into his health issues at this time. (Corpus Dep., Doc. 37-1, at 270, 342-44).

Defendant typically performs employee performance reviews in February, so in 2018 Plaintiff did not receive a review because he was on FMLA leave. (Telega Dep., Doc. 37-3, at 35-36). He did not receive a pay raise. Performance reviews are not required by company policy. *Id.* The majority of employees received annual performance reviews. (Svancara Dep., Doc. 38, at 28). But Telega testified Plaintiff would not have gotten a raise in 2018 even if his performance was reviewed, because "he didn't meet and exceed the requirements from the goals we set in place across the board." (Telega Dep., Doc. 37-3, at 34).

Defendant's written policy leaves salary raises within its discretion. (Doc. 36-11, at 2). Other sales staff received performance reviews in 2018, with some receiving raises. Tom Ristvey generated $302,000 in revenue against a $400,000 sales goal in 2018, and received no raise in 2019. (Doc. 41-2, at 2, 4). Jordan Morran, in his first six months on the job starting in June 2017, generated no revenue but met his call notes/contacts goal, and received a three percent raise in August 2018. (Telega Dep., Doc. 37-3, at 111-112; Doc. 41-1, at 5). In 2017, Brian Peisker sold $470,591 against a sales quota of $600,000, and received a two percent raise in January 2018. (Doc. 41-5, at 2-3).

In late April 2018, as his FMLA leave was almost exhausted, Plaintiff and Defendant worked out a solution to accommodate Plaintiff's remaining restriction, namely his inability to drive. (Doc. 36-23, at 1). Specifically, Plaintiff would work in the shop Monday, Wednesday, and

Friday, and from home Tuesday and Thursday. *Id.* Kuntze told Plaintiff he needed to be in the shop "to assist Justin and to make sales calls." *Id.* Telega and Svancara also assisted Plaintiff if he needed to meet with customers in person; Plaintiff's uncle also drove him when necessary. (Corpus Dep., Doc. 37-1, at 236-37). Plaintiff testified Telega told him he did not expect him to obtain new customers. *Id.* at 103-14.

After several months back on the job, Svancara and Telega became concerned with Plaintiff's complete lack of revenue generation. (Svancara Decl., Doc. 36-2, at ¶ 14). They scheduled a "sales blitz" in June 2018 to assist Plaintiff's sales efforts. *Id.*; Corpus Dep., Doc. 37-1, at 244-45. Plaintiff told Telega he "should have about 3 or 4 proposals next week alone" from the blitz (Doc. 36-28, at 1), but ultimately did not secure any new business (Corpus Dep., Doc. 37-1, at 246).

Defendant issued a "verbal documented warning" in late August 2018 for absenteeism. (Doc. 36-30, at 1). Kuntze wrote in an email that Plaintiff missed the prior week of work and had exhausted any available source of leave. *Id.* Plaintiff disputes the correctness of his discipline, arguing he worked from his hospital bed that week. (Corpus Dep., Doc. 37-1, at 260).

By early December 2018, Svancara concluded Plaintiff was not performing his duties. (Svancara Decl., Doc. 36-2, at ¶¶ 19-20). Plaintiff had not generated any revenue and had prepared only fourteen proposals compared to his goal of 72 for 2018. *Id.* at ¶ 19; Doc. 36-33, at 1-2. Defendant terminated Plaintiff's employment on December 12, 2018. (Doc. 36-34, at 1).

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record

in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*.

**DISCUSSION**

Defendant moves for summary judgment on all four counts of Plaintiff's Complaint. *See* Doc. 36-1. Plaintiff identifies three adverse employment actions by Defendant – its decision not to award him a raise in February 2018, issuing a warning for absenteeism in August 2018, and its decision to terminate his employment in December 2018. Plaintiff argues those actions interfered with his FMLA rights, were retaliation for using FMLA leave, are discriminatory based on his national origin, and are retaliation for his involvement in an inappropriate workplace conduct investigation. *See* Doc. 1, at ¶¶ 23, 28, 37, 46. Defendant argues its decision not to give Plaintiff a raise, and its warning for absenteeism, are not significant enough to be adverse employment actions. (Doc. 36-1, at 12-13). It further argues it terminated Plaintiff's employment solely because of his poor performance, not for any unlawful reason.

FMLA Interference

Along with the above-mentioned three adverse employment actions, Plaintiff also argues in his opposition to Defendant's motion for summary judgment that Telega repeatedly called him while on leave asking him to work, which also interfered with his FMLA rights. (Doc. 39, at 17).

5

Defendant argues that, because Plaintiff used all his leave benefits, this action cannot have interfered with his FMLA rights. (Doc. 36-1, at 10-11).

To establish Defendant interfered with his FMLA rights, Plaintiff must show "(1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled." *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012).

Defendant's argument focuses on the last prong – that by permitting Plaintiff to use twelve full weeks of FMLA leave from February 3, 2018, through May 7, 2018, as a matter of law it cannot have interfered with Plaintiff's FMLA rights.[2] Plaintiff argues Defendant's denial of a performance review and salary increase and Telega "repeatedly calling/emailing [ ] asking him to work while on FMLA leave and needlessly prying into [his] medical condition, prognosis and return to work" interfered with his FMLA rights. *See* Doc. 39, at 17. Rather than develop an argument, Plaintiff simply lists ten cases seemingly to illustrate this conduct is FMLA interference. *Id.* at 17-18. These cases appear to stand for the proposition that actions which discourage an employee from using leave constitute an interference claim. *See, e.g.*, *Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003).

First, Plaintiff has not shown Telega's email interfered with his FMLA rights. As Plaintiff began his FMLA leave in February 2018, Telega emailed him twice asking for current customer contact names and pending proposals. (Telega Dep., Doc. 37-3, at 41-42); (Doc. 39-10, at 1-2).

---

2. Defendant, in a footnote, mentions Plaintiff is not actually an FMLA-eligible employee but it treated him as if he were. (Doc. 36-1, at 10, n.3). By treating him as an eligible employee, Defendant is likely estopped from denying his eligibility now. *See Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009). Additionally, because Defendant does not develop the argument any further, the Court treats Plaintiff as an eligible employee.

But the law Plaintiff cites shows this kind of *de minimis* contact cannot support an FMLA interference claim. "The general consensus among courts is that reasonable contact limited to inquiries about the location of files or passing along institutional or status knowledge will not interfere with an employee's FMLA rights; however, asking or requiring an employee to perform work while on leave can constitute interference." *Smith-Schrenk v. Genon Energy Servs., L.L.C.*, 2015 WL 150727, at *9 (S.D. Tex.). The Sixth Circuit has not clearly defined how much contact, or what sorts of tasks, are actionable interference with FMLA rights. *See Tilley v. Kalamazoo Cty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016) ("Perhaps, under certain circumstances, multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted and thereby discouraged."). But requests to pass on institutional knowledge, alone, do not support an interference claim. *See Vess v. Scott Med. Corp.*, 2013 WL 1100068, at *3-4 (N.D. Ohio). Because Plaintiff has presented evidence of only this sort of contact from Defendant, summary judgment is appropriate on this theory of his interference claim.

Second, Plaintiff has also not presented sufficient evidence of offensive or prying contacts from Telega to support an interference claim. Plaintiff testified Telega pried into his health issues and contacted him more often than he preferred. (Corpus Dep., Doc. 37-1, at 270, 342-44). Regulations prohibit an employer from discouraging an employee from using FMLA leave. 29 C.F.R. § 825.220(b); *Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003). But Plaintiff identifies no law forbidding an employer from asking for medical information from an employee who is using FMLA leave. *See Kitts v. Gen. Tel. N., Inc.*, 2005 WL 2277438, at *13 (S.D. Ohio) ("Plaintiff cannot cite to any section of the FMLA or its regulations that provides employees with a right to medical privacy, or gives them the right to refuse to truthfully answer questions

7

concerning FMLA absences."). Indeed, an employer can require medical certification of an employee's health condition, which includes disclosing symptoms, diagnoses, doctor visits, and whether medication is prescribed, among other information. 29 C.F.R. § 825.306(a)(3). And while Plaintiff testified Telega asked him to work, the only specific requests Plaintiff describes are the above-discussed requests for information that do not violate the FMLA. (Corpus Dep., Doc. 37-1, at 342-43). In short, this testimony is insufficient to support an FMLA interference claim.

Third, Plaintiff's briefing identifies only Defendant's denial of a performance review and a raise as interference, seemingly abandoning his Complaint's assertions about his firing and discipline as interference claims. *See* Doc. 39, at 17; *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). The FMLA prohibits using FMLA leave as a negative factor in employment actions. 29 C.F.R. § 825.220(c). In this instance, Plaintiff argues he was denied a performance review because he was on FMLA leave at the time Defendant performed such reviews. Then, he argues that performance review was essential to receive his deserved raise, and thus ties the denial of a raise to his FMLA leave. But, under company policy, he was not entitled to a performance review. (Telega Dep., Doc. 37-3, at 35-36). Because Defendant did not interfere with an FMLA-protected right of Plaintiff's, his entire FMLA interference claim fails, and Defendant is entitled to summary judgment on Count One.

FMLA Retaliation

Plaintiff also alleges Defendant retaliated against him for taking FMLA leave, again citing the same three adverse actions. (Doc. 1, at ¶¶ 26-31). Defendant admits these three actions

occurred, but denies they are unlawful retaliation for various reasons. (Doc. 36-1, at 12-16). Each will be discussed in turn.

To establish a *prima facie* case of FMLA retaliation, Plaintiff must show: (1) he was engaged in protected FMLA activity; (2) Defendant knew he was engaged in such activity; (3) after learning of such activity, Defendant took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Absent direct evidence,[3] courts use the familiar employment law burden-shifting framework: when a plaintiff establishes a *prima facie* case of retaliation, a defendant then bears the burden to show evidence of a legitimate, non-discriminatory reason for the adverse action, which shifts the burden back to plaintiff to show that proffered reason is mere pretext. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

*Denied Salary Increase*

Plaintiff argues Defendant's decision to not give him a performance review or a salary increase in February 2018 was unlawful retaliation. Defendant argues Plaintiff cannot satisfy his initial, *prima facie* burden, because no adverse action was taken.

Defendant argues denying Plaintiff a raise was not an adverse action, because he was not entitled to one based on his 2017 performance. (Doc. 36-1, at 4, 13). Plaintiff contends deposition testimony shows he did not receive a performance review because he was out on FMLA leave, and because that performance review was required to receive a raise, Defendant necessarily did not give him a raise because he was out on FMLA leave. (Doc. 39, at 13-14).

---

3. Plaintiff makes clear he does not believe there is direct evidence of FMLA retaliation. *See* Doc. 39, at 11 ("As to FMLA retaliation, the two disputed issues are "causal connection" and "pretext.").

An adverse employment action is more than "a bruised ego" or a "mere inconvenience or an alteration of job responsibilities". *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004). To make out his *prima facie* case, Plaintiff needs to show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker" from using FMLA rights. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).

First, Plaintiff not receiving a performance review does not satisfy the adverse action element of his prima facie case. Telega testified he did not give Plaintiff a performance review in February because Plaintiff was absent and did not give him one upon his return because it was not required. (Telega Dep., Doc. 37-3, at 36). Plaintiff latches onto this statement in an attempt to show he did not receive a raise because he used FMLA leave. (Doc. 39, at 13). Plaintiff argues an annual performance appraisal is "the starting point of every salary increase", so denying him a review is tantamount to denying him a raise. (Doc. 39, at 6). But the cited deposition transcript does not support this proposition. *See id.* (citing Svancara Dep., Doc. 38, at 30-33). Defendant did not review Plaintiff's performance in February because he was out of the office on FMLA leave. (Telega Dep., Doc. 37-3, at 36). But a missed performance evaluation, alone, is not an adverse employment action. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) ("[A] negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary."). Thus, the missing performance evaluation is only an adverse employment action if it caused some other negative impact.

Plaintiff argues the missing performance review cost him a raise. But not getting a raise, alone, does not satisfy the adverse action element. Subjective expectation, and subsequent

disappointment, does not satisfy the adverse employment action element of Plaintiff's *prima facie* case. *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 911 (E.D. Mich. 2007) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996)). But a history of raises despite poor performance reviews can undermine the legitimacy of the defendant's rationale and permit a plaintiff to survive summary judgment. *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 999 (6th Cir. 2009)[4]. Thus the relevant question here is whether the evidence creates a genuine dispute of material fact as to Plaintiff's entitlement to a raise.

Defendant presents evidence Plaintiff would not have gotten a raise in February 2018 even had he been available for a performance review. Telega testified Plaintiff did not get a raise because "he didn't meet and exceed the requirements from the goals we set in place across the board." (Telega Dep., Doc. 37-3, at 34). He also testified to wanting to replace Plaintiff in 2017, before he took any FMLA leave. *Id.* at 72. Plaintiff calls this "laughable" (Doc. 39, at 14), but that does not satisfy his burden to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Additionally, Defendant's written policy leaves salary raises wholly in its discretion, as a means to recognize superior employment performance. (Doc. 36-11, at 2). Plaintiff argues the record shows this is not true, and raises were handed out, both to him and to others, even when they came well short of objectively "superior performance". Plaintiff argues "[t]he evidence establishes that [his] performance in 2017 was good enough to earn him at least a standard 3% raise." (Doc. 39, at 13).

---

4. Though this case is based in Ohio law, the claims were analyzed under the same standards as federal employment claims. *Wharton*, 309 F. App'x at 995.

In November 2014, Plaintiff received a three percent raise (Svancara Dep., Doc. 38, at 65) after exceeding generating $533,065 in revenue against a $300,000 sales goal the prior year. (Doc. 39-5, at 4). In February 2016, Plaintiff received a 7.875 percent raise (Svancara Dep., Doc. 38, at 65) after exceeding his 2015 $500,000 sales goal by generating $742,059 of revenue. (Doc. 39-6, at 1). In January 2017, Plaintiff received a 2.5 percent raise (Svancara Dep., Doc. 38, at 66) despite not meeting his sales goal the prior year and generating $430,801 against an annual goal of $500,000. (Doc. 39-7, at 4).

Additionally, Plaintiff presents evidence of the following six salespersons who received performance reviews, some of whom received salary increases, as comparisons to show Defendant denied him a performance review and raise for impermissible reasons. (Doc. 39, at 13).

Tom Ristvey generated $302,000 in revenue against a $400,000 sales goal in 2018, and received no raise in 2019. (Doc. 41-2, at 2, 4). Jordan Morran, in his first six months on the job starting in June 2017, generated no revenue but met his call notes/contacts goal, and received a three percent raise in August 2018. (Telega Dep., Doc. 37-3, at 111-12; Doc. 41-1, at 5). In 2017, Brian Peisker sold $470,591 against a sales quota of $600,000, and received a two percent raise in January 2018. (Doc. 41-5, at 2-3). Derek Rieser sold $26,582 against a $150,000 sales quota, but whether he received a raise for those efforts is not in the record. *See* Doc. 41-4, at 1-3. Cindy Paulus, who sold $337,641 in 2017 against a $450,000 sales goal, received a two percent raise the following year. (Doc. 41-6, at 2). Susan Dodson received a promotion in September 2017, and so did not receive a customary review. *See* Doc. 41-7, at 1-2.

Plaintiff argues the above evidence shows that, had he received a performance review in 2018, his 2017 sales would have resulted in, at least, a three percent raise. (Doc. 39, at 13). In 2017, Plaintiff exceeded his sales goal, generating $613,353 against a $550,000 goal. (Doc. 36-5,

at 1). But Defendant caveats that number – more than one-third of Plaintiff's annual revenue came from a national account, for which he performed minimal work but still receives the revenue credit. (Svancara Decl., Doc. 36-2, at ¶ 12). The "Fresnius National Account" brought in $245,306 of Plaintiff's $613,353 in annual revenue. *See* Doc. 36-6, at 1. Without the national account, Plaintiff would have generated only $368,047 in revenue, short of his $550,000 goal. But Plaintiff testified he did the legwork for this sale, even though that is an unusual way to generate revenue from a national account. (Corpus Dep., Doc. 37-1, at 140-43).

The proof in *Wharton* is instructive here in this case—the plaintiff there had previously received consistent performance reviews with negative comments, and consistent salary raises in spite of those comments; after Plaintiff took FMLA leave (the only changed circumstance), the defendant denied him a salary raise. *Wharton*, 309 F. App'x at 999. Here, the evidence shows Plaintiff's performance influenced his salary raises—he received a larger raise when he exceeded his goal and a smaller raise when he fell short of his goal. And there is evidence Defendant denies salary raises for underperforming employees. (Doc. 41-2, at 2, 4). But there is an issue of material fact regarding whether Plaintiff underperformed the year prior to the denial of his raise. While Svancara's Declaration shows Plaintiff did minimal work to earn credit for the Fresenius account, Plaintiff testifies to the contrary. *Compare* Svancara Decl., Doc. 36-2, at ¶ 12 *with* Corpus Dep., Doc. 37-1, at 140-43. And there is no evidence in the record that shows sales staff meeting or exceeding their goals and not getting a raise – to the contrary, even employees who fell short could see some sort of raise, including Plaintiff himself. *See* Doc. 39-7, at 4; Doc. 41-5, at 2-3. Thus, there is an issue of material fact as to whether Plaintiff was entitled to a raise based on his performance, satisfying that element of his *prima facie* case.

13

Additionally, Plaintiff satisfies the causal connection element of his *prima facie* case through temporal proximity. While Defendant presents evidence it would not have given a raise regardless of Plaintiff's performance, that decision was not formally made because Plaintiff was out on FMLA leave. (Telega Dep., Doc. 37-3, at 35-36). That is, Defendant never contemporaneously put pen to paper denying Plaintiff a salary raise because he was unavailable to reviewed at the company's customary time for such reviews. This temporal connection between the leave and the salary raise decision time satisfies Plaintiff's *prima facie* case for summary judgment purposes. *See Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).

*Absenteeism Discipline*

Plaintiff also claims his August 2018 discipline for missing work was retaliation for using FMLA leave earlier that year. (Doc. 36-1, at 14-15). Kuntze emailed Plaintiff documenting a "verbal warning" because Plaintiff did not work the prior week and had no FMLA leave, sick leave, or vacation time available. (Doc. 36-30, at 1). Plaintiff contends he worked that week, though not in the office. (Corpus Dep., Doc. 37-1, at 260). A verbal warning alone is not a materially adverse action sufficient to support a retaliation claim. *Finley v. City of Trotwood*, 503 F. App'x 449, 454 (6th Cir. 2012). But a written warning, accompanied by other consequences, can be a materially adverse action. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 348 (6th Cir. 2012) ("Before the discipline, Chattman was eligible to be promoted. After the discipline, he was ineligible. While it is disputed whether Chattman would have received a promotion during that one-year period but for the warning, the relevant analysis at this point is simply whether the terms of Chattman's employment adversely changed. They did.").

Plaintiff argues Defendant used this warning "to get one step closer to its objective – getting rid of [him] because his FMLA leave prevented him from generating $500,000 in new customer

14

sales revenue." (Doc. 39, at 15). He argues testimony shows Telega "[f]rom the beginning . . . wanted to terminate [him] and replace him with someone else". But that cuts both ways, because "the beginning" precedes Plaintiff's FMLA leave. That testimony from Telega shows he wanted to replace Plaintiff the prior year. (Telega Dep., Doc. 37-3, at 44). And Plaintiff has presented no evidence that opinion changed prior to Defendant's ultimate decision to terminate Plaintiff's employment. (Doc. 36-39, at 1). Plaintiff has not presented evidence to connect this warning with his ultimate termination or any other significant consequence. Therefore, the warning, even if Defendant acted based on an incorrect understanding of the facts, fails to support a retaliation claim.

*Termination*

Unlike the above two incidents, there is no question Defendant firing Plaintiff was an adverse employment action. The primary issue is whether Plaintiff can show using FMLA leave caused his termination. He presents two competing stories about his last year of employment with Defendant. In the first, Defendant illegally maintained a $500,000 sales goal without accommodating Plaintiff's work time lost to FMLA leave. (Doc. 39, at 7, 16). In the second story, relying solely on Plaintiff's own testimony, representatives of Defendant told him he did not need to worry about making sales to new customers until the following year, and that he would not be held to any goal for 2018. (Doc. 39, at 7-8). Rather than accepting one as true over the other, the Court analyzes each in turn.

In the first version, Plaintiff labored illegally under a sales goal that did not accommodate the twelve weeks of missed work. (Doc. 39, at 7, 16). An employer can violate an employee's FMLA rights by holding him to an unadjusted sales goal following FMLA leave. *See Wojan v. Alcon Laboratories, Inc.*, 2008 WL 4279365, at *4-5 (E.D. Mich.); *Gostola v. Charter Commc'ns*,

*LLC*, 72 F. Supp. 3d 796, 803 (E.D. Mich. 2014). These cases analyze an interference claim, not a retaliation claim. *Id.* But Plaintiff seems to be arguing for an extension of their logic – that holding a salesperson to a sales goal unadjusted to his FMLA leave is causal evidence connecting his termination to his FMLA leave.

Making out a *prima facie* case "is not onerous." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 377 (6th Cir. 1984). "[T]o establish the element of causal link a plaintiff is required to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal quotation omitted). Defendant asserts it fired Plaintiff because of his poor sales record. (Svancara Decl., Doc. 36-2, at ¶¶ 19-20). Plaintiff's sales goal was not adjusted to accommodate his FMLA leave. (Telega Dep., Doc. 37-3, at 51). Case law shows Plaintiff had a right to an accommodated sales goal. This appears sufficient for Plaintiff to make out his *prima facie* case of FMLA retaliation.

But Defendant has a legitimate, non-discriminatory reason for firing Plaintiff: Plaintiff's failure to generate any new revenue in 2018. *See* Doc. 36-1, at 16. The record supports this reason – Plaintiff's final scorecard revealed no revenue generated in 2018, and only 86 call notes/contacts against a goal of 2,500. (Doc. 36-32, at 1). Failing to generate revenue for seven months as a salesman is a legitimate non-discriminatory reason for terminating Plaintiff's employment.

And Plaintiff cannot show that reason is pretext. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co.*, *LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Plaintiff tries, and fails, to show he did actually

generate revenue through an affidavit filed after Defendant's reply. (Doc. 44).[5] As to Defendant's true motivation, unrefuted evidence shows Defendant's management wanted to fire Plaintiff prior to his FMLA leave, but he remained employed for more than seven months after returning from leave. (Telega Dep., Doc. 37-3, at 44). Nor can Plaintiff show falling so far short of his sales quota is not a fireable offense, particularly considering the record evidence that even with his past, superior, performance his employer considered replacing him. *Wojan* and *Gostola* held Plaintiff had a right to an adjusted sales goal, but they did not hold Plaintiff could not be held to *any* sales goal. *See Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 451 (6th Cir. 2017) ("A four-month lapse between Parkhurst's FMLA leave and her termination, when considered alongside her documented underperformance, is hardly 'suspicious.'"). Therefore, Plaintiff cannot show his firing was illegal retaliation under this theory.

In the alternative story, Plaintiff was told he had no sales quota to meet in 2018, leaving him surprised when Defendant terminated his employment for failing to generate enough revenue.

---

5. After Defendant filed its reply brief, Plaintiff filed an additional Declaration (Doc. 44) responding to Svancara's Second Declaration (Doc. 43-1). The issue is whether Plaintiff generated revenue from Tiffin Transportation, LLC. Defendant moved to strike Plaintiff's declaration. (Doc. 45). Plaintiff opposed that motion (Doc. 46), Defendant replied in support of its motion (Doc. 47), and Plaintiff filed a sur-reply (Doc. 48). Defendant moved to strike the sur-reply (Doc. 49), which Plaintiff opposed (Doc. 50).

Nothing in Plaintiff's Declaration (Doc. 44), nor the prior Declaration from Thomas Maiberger, Tiffin Transportation, LLC's President (Doc. 40-1, at 1-5) creates an issue of material fact that prevents summary judgment, because they do not contradict Svancara's Declaration (Doc. 43-1). Both Svancara and Maiberger describe a business relationship that fell apart, and these declarations contain no evidence Plaintiff generated actual revenue from Tiffin Transportation. *See* Doc. 40-1, at ¶10 ("On behalf of Tiffin Transportation, I agreed to forget about the lease agreement I signed in September 2018, and I agreed to part ways with Aim Leasing".); Doc. 43-1, at ¶ 9 ("This deal would have generated approximately $22,000 in revenue in 2018. However, Tiffin cancelled the agreement later that month."). Because Plaintiff's Second Declaration is irrelevant to the Court's ultimate decision, and it was filed outside the normal course of motion practice, the Court grants Defendant's Motion to Strike, but denies its motion for sanctions.

(Doc. 39, at 16). Defendant spends much of its reply questioning the credibility of Plaintiff's testimony, pointing to evidence which undercuts Plaintiff's testimony that he was not expected to generate any revenue in 2018.[6] *See* Doc. 43, at 3-5. Defendant presents evidence it reduced Plaintiff's sales goal from 2017 to 2018 by $50,000. *Compare* Doc. 36-5, at 1 *with* Doc. 36-32, at 1. It also shows Plaintiff scheduled and participated in a "sales blitz" for his sales territory. (Corpus Dep., Doc. 37-1, at 244). Plaintiff told Telega he had "tons of stuff I am working on from the Blitz should have about 3 or 4 proposals next week alone." (Doc. 36-28, at 1). Additionally, the parties dispute whether a September 2018 meeting occurred between Plaintiff and his supervisors, during which Plaintiff would have been told his job performance was unacceptable. *Compare* Svancara Decl., Doc. 36-2, at ¶ 18; Doc. 36-39, at 1; Doc. 39-20, at 1 *with* Corpus Dep., Doc. 37-1, at 265. Finally, in an email, Kuntze told Plaintiff his job duties included making sales calls. (Doc. 36-23, at 1).

Defendant argues the documentary evidence overwhelms Plaintiff's "self-serving" testimony. (Doc. 43, at 3). But only when testimony spins a "visible fiction . . . so utterly discredited by the record that no reasonable jury would have believed it" will Plaintiff's testimony be set aside and ignored. *United States v. Hughes*, 606 F.3d 311, 319 (6th Cir. 2010). Though not limited to video evidence, this line of cases is typically applied when testimony is contradicted by video. *Coble v. City of White House*, 634 F.3d 865, 868 n.3 (6th Cit. 2011); *see also Carter v. City of Wyoming*, 294 F. App'x 990, 992 (6th Cir. 2008) (MRI evidence that "cast doubt on [Plaintiff's]

---

6. Defendant argues Plaintiff's self-serving testimony cannot permit him to survive summary judgment. (Doc. 43, at 3). Defendant's citation of explicitly overruled, out-of-circuit precedent supporting the contrary proposition is unavailing. *See Hill v. Tangherlini*, 724 F.3d 965, 967, n.1 (7th Cir. 2013) ("[T]oday we make clear that the following cases are overruled to the extent that they suggest a plaintiff may not rely on "self-serving" evidence to create a material factual dispute. *See, e.g.,* . . . *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002)[.]").

version of the facts" did not eliminate a genuine issue of material fact). Plaintiff's testimony is opposed by contemporaneous communications that contradict his testimony. *See* Doc. 36-23, at 1. And the remaining evidence all leans against crediting Plaintiff's testimony on what his job duties were when he returned from FMLA leave. But the "visible fiction" standard described above is just that – an exception to the normal rule that facts are viewed "in the light most favorable to the nonmoving party…" *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, the evidence is not so "blatantly contradicted by the record" that this Court can disregard Plaintiff's testimony at this summary judgment stage. *Id.*

But, even treating Plaintiff's testimony as true for purposes of summary judgment, Defendant is still entitled to summary judgment on Plaintiff's retaliation claim. To make out a *prima facie* case, Plaintiff needs to show a connection between his protected activity – the FMLA leave, and the adverse action – terminating his employment. *Donald*, 667 F.3d at 761. Plaintiff returned to work in May 2018 (Doc. 36-26, at 1-6), and his employment was terminated in December 2018 (Doc. 36-34, at 1). "A time lag of seven months does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Parnell v. West*, 114 F.3d 1188, 1997 WL 271751, at *3 (6th Cir. 1997); *see also Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation."). Too much time elapsed between Plaintiff's FMLA leave and his termination for temporal proximity alone to support Plaintiff's *prima facie* case.

And Plaintiff has not presented additional evidence to support an inference of causal connection between his leave and his termination. In the light most favorable to Plaintiff, he was

19

permitted to work seven months as a salesman free of any obligation to generate revenue before Defendant terminated his employment for what it deemed poor performance. This does not draw a causal line between his termination and his use of FMLA leave. Plaintiff's argument is that his supervisors lied to him, telling him they did not expect him to generate revenue before firing him for not generating revenue. But record evidence shows Plaintiff tried, at least sporadically, to generate revenue. *See, e.g.*, Doc. 36-28, at 1. That is, the unrefuted evidence shows Plaintiff still engaged in sales work after returning from FMLA leave, upon which Defendant could determine whether Plaintiff met its expectations. This undermines his argument that a false instruction from Defendant set him up for failure, because he continued attempting to fulfill his duties. And there is no evidence of the plan that Plaintiff alleges Defendant engaged in to get him fired. As discussed above, adverse actions taken in response to poor performance do not support an FMLA retaliation claim. Therefore, Defendant is entitled to summary judgment on this theory of Plaintiff's retaliation claim.

### State Law Retaliation

Plaintiff claims Defendant retaliated against him for his involvement in a 2017 investigation into another employee's racial harassment. (Doc. 1, at ¶¶ 32-41). He alleges the failure to get a raise in early 2018, the absenteeism discipline, and his ultimate termination all happened "because he opposed an 'unlawful discriminatory practice'". *Id.* at ¶ 37.

"To establish a prima facie claim of retaliation under R.C. 4112.02(I), a plaintiff has to show that: (1) he or she engaged in a protected activity; (2) his or her employer knew of his participation in the protected activity; (3) he or she suffered an adverse employment action; and (4) a causal link existed between the protected activity and the adverse action." *Meyers v. Goodrich Corp.*, 2011-Ohio-3261, ¶ 13 (Ohio Ct. App.). Protected activity includes both participation and

opposition. *Brown v. O'Reilly Auto. Stores, Inc.*, 54 N.E.3d 638, 647 (Ohio Ct. App.). Participation involves "making a charge, testifying, assisting, or participating in any manner in any investigation, proceeding, or hearing" under Ohio law. *Id.* Opposition involves making "an overt stand against suspected illegal discriminatory action." *Coch v. GEM Indus.*, 2005-Ohio-3045, ¶ 32 (Ohio Ct. App.). Additionally, to prove his retaliation claim, Plaintiff must show "the retaliatory animus was a determinative, not merely motivating, factor." *Smith v. Dep't of Pub. Safety*, 997 N.E.2d 597, 614 (Ohio Ct. App.).

Plaintiff argues he opposed two discriminatory practices during his time with Defendant, and this opposition ultimately caused his termination. (Doc. 39, at 20). He argues his confrontation, and his conversation with Defendant's HR staff, was protected activity Defendant used against him. *Id.* Additionally, Plaintiff argues that after an employee quit her job with Defendant following racist harassment, he hired another Black woman against the wishes of his superiors. *Id.* Defendant argues neither of these actions satisfy the first element of Plaintiff's *prima facie* case—that is, Plaintiff did not engage in protected activity. (Doc. 36-1, at 18). It also argues Plaintiff has no evidence tying these actions to the identified adverse employment actions. *Id.*

Even assuming, *arguendo*, these actions were protected activity, Plaintiff has presented no evidence to connect his protected activity to any of the allegedly adverse employment actions he suffered. "[W]here some time elapses between the employer's discovery of a protected activity and the subsequent adverse employment action, the employee must produce other evidence of retaliatory conduct to establish causality." *Bahar v. Youngstown*, 2011-Ohio-1000, ¶ 8 (Ohio Ct. App.). In this case, multiple years passed between December 2015, when Defendant's HR staff interviewed Plaintiff about the incident, and when Defendant took the first allegedly adverse action against Plaintiff. *See* Doc. 36-35, at 1.

21

Plaintiff's opposition states, with no further elaboration, that "[his] opposition to workplace discrimination was the true reason for the adverse actions taken against him." (Doc. 39 at 20). But that does not prevent summary judgment. "The nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). Plaintiff has no evidence connecting his protected activity to the adverse actions, and therefore cannot make out a *prima facie* case. Thus, Defendant is entitled to summary judgment on this state law retaliation claim.

*National Origin Discrimination*

Plaintiff's fourth claim is that Defendant discriminated against him based on national origin. (Doc. 1, at ¶¶ 42-50). He based this claim in Ohio law. *Id.* To make out a *prima facie* case of national origin discrimination under Ohio law, Plaintiff must show he is a member of a protected class, he suffered an adverse employment action, he was qualified for the position, and comparable, non-protected employees received more favorable treatment. *Jaber v. FirstMerit Corp.*, 81 N.E.3d 879, 886 (Ohio Ct. App.).

Defendant's briefing focuses entirely on the last element. *See* Doc. 36-1, at 19-20. Ohio "law is clear that in order for this element to be successfully established, the parties to be compared must be similarly-situated in all respects; that is, they must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Valentine v. Westshore Primary Care Assoc.*, 2008-Ohio-4450, ¶ 89 (Ohio Ct. App.) (internal quotation omitted). And, in a wrongful discharge context, the "more

favorable treatment" element can also be met by showing Plaintiff was replaced by someone outside his protected class. *Goodyear v. Waco Holdings, Inc.*, 2009-Ohio-619, ¶ 31 (Ohio Ct. App).

First, as discussed above, a warning absent further negative consequences does not satisfy the adverse employment action element. *Perez v. Theller*, 2011-Ohio-2176, ¶ 15 (Ohio Ct. App.) ("The verbal and written warnings and the written reprimands were also not adverse actions."). The absenteeism discipline against Plaintiff cannot support a national origin discrimination claim.

Second, Ohio law permits the denial of a raise to satisfy the adverse employment action element of a *prima facie* case. *See Canady v. Rekau & Rekau, Inc.*, 2009-Ohio-4974, ¶ 27 (Ohio Ct. App.). And, as discussed above, Defendant provides evidence of a legitimate, nondiscriminatory reason for denying Plaintiff a raise. Thus, this claim comes down to whether Plaintiff can prove that reason is pretext. "The burden on the plaintiff under the third step 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Waddell v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, ¶ 30 (Ohio Ct. App.) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). As discussed above, Plaintiff has presented evidence that creates a genuine dispute of material fact regarding Defendant's proffered legitimate nondiscriminatory reason. But, unlike as to his FMLA leave, Plaintiff fails to provide evidence that shows he was subject to intentional discrimination because of his national origin. Testimony shows Plaintiff was the only Mexican American employed by Defendant during Plaintiff's tenure. (Doc. 40, at ¶ 9; Svancara Dep., Doc. 38, at 22). During his tenure, Plaintiff received raises, including when he fell short of his sales quota. (Svancara Dep., Doc. 38, at 66); (Doc. 39-7, at 4). When the same supervisors make positive and adverse employment decisions, the Court may "strongly infer a nondiscriminatory motivation in the later action." *Crawford v. Kirtland Loc. Sch. Dist. Bd. of Educ.*, 2018-Ohio-4569, ¶ 69 (Oh. Ct. App.).

23

Because Plaintiff did not present evidence rebutting that inference, summary judgment on this claim is appropriate.

Finally, Defendant is entitled to summary judgment on Plaintiff's claim that he was fired because of his national origin. Plaintiff's poor sales record in 2018 is a mitigating factor that prevents Plaintiff from showing similarly situated employees were treated better. *Valentine*, 2008-Ohio-4450, ¶ 89. Plaintiff argues, without any record citation, that six other salespersons "performed equally as bad". (Doc. 39, at 19). Plaintiff testified he was told Defendant employed a salesman who sold nothing for two years without being fired. (Corpus Dep., Doc. 37-1, at 311). But Defendant's records show this individual generated a minimal volume of revenue and left the company six months into his last year of poor sales. (Doc. 36-44, at 1-3). Therefore, Plaintiff's *prima facie* case fails, because he has not identified anyone with a comparably poor sales record who was treated more favorably.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is hereby

ORDERED that Defendant Aim Leasing Company's Motion for Summary Judgment (Doc. 36) be, and the same hereby is, GRANTED in part and DENIED in part as described herein; and it is

FURTHER ORDERED that Defendant's Motion to Strike (Doc. 45) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Defendant's Supplemental Motion to Strike and Motion for Sanctions (Doc. 49) be, and the same hereby is, DENIED.

Plaintiff's claim for FMLA retaliation related to Defendant's denial of his 2018 raise can proceed.

　　　　　　　　　　　　　　　　　　　　　 s/ *James R. Knepp II*
　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE